Filed 7/25/22  In re S.R. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re S.R., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>A.R.,<br><br>　　　Defendant and Appellant. | A164102<br><br>(Sonoma County<br>Super. Ct. No. DEP6163) |

The juvenile court terminated the parental rights of A.R. (mother) over her now two-year-old daughter S.R.  On appeal, mother challenges the juvenile court's (1) denial of her petition under Welfare and Institutions Code section 388[1] seeking to provide six months of reunification services and (2) termination of her parental rights.  She also contends the juvenile court erred by failing to make findings regarding compliance with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).  The Sonoma County Department of Human Services (Department) concedes error regarding the

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

ICWA issue and requests that the order terminating parental rights be conditionally affirmed with directions to comply with ICWA. We affirm the order denying mother's section 388 petition and conditionally affirm the order terminating parental rights. However, we remand for the limited purpose of determining ICWA compliance.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Prior Sacramento County Dependency Proceedings Regarding S.R.'s Half Siblings*

In 2014, mother's four other children, S.R.'s half siblings, were removed from mother and their father, J.J., due to mother's substance abuse and mental health issues and J.J.'s failure to protect them from mother. Mother received family reunification services, and J.J. received family maintenance services. In June 2015, a psychological evaluation of mother concluded that mother was unlikely to benefit from further reunification services within the legal time frame for reunification and that she would likely require a residential treatment program to address her mental health and substance abuse issues. In July 2015, the dependency case was closed and J.J. was granted sole physical and legal custody of the children.

In September 2015, S.R.'s half siblings were again removed from their parents' care due to domestic violence and J.J.'s failure to protect the children. At the time, mother was living in the home with J.J. and the children in violation of a court order. Reunification services were provided to mother and J.J. The services were terminated in October 2016 due to their failure to comply with their case plans. In March 2017, the Sacramento Juvenile Court ordered legal guardianship of the children with maternal relatives. The dependency proceeding was dismissed in September 2017.

2

## II.    *Petition Regarding S.R.*

On July 14, 2020, the Department filed a dependency petition alleging that S.R., who was four months old, came within the jurisdiction of the juvenile court under subdivisions (a), (b)(1), (g) and (j) of section 300. The petition alleged S.R. was at risk of physical harm due to three incidents of domestic violence in May and July 2020 between mother and R.R., whom the petition alleged was S.R.'s father.[2]  The petition alleged that in May 2020 R.R. strangled mother and threatened her with a firearm while S.R. was in her care.  On July 4, 2020, R.R. struck mother on her neck and her eye. Further, he dragged mother to her vehicle while she was carrying S.R.  On July 6, 2020, R.R. smacked mother on the side of her head with both hands while she was in their bed.  He then grabbed her neck with both hands, pinned her against a wall, squeezed her neck for six to eight seconds, and threw two frozen water bottles at her head while calling her names.  Then he squeezed her chin and bit her nose and lips with his dentures.  S.R. was in the bed with mother at the time of the assault.

The petition further alleged that mother was dishonest with the Department about her living conditions and that she continued to live with R.R. despite having an emergency protective order.  The petition also alleged mother had untreated mental health issues, including diagnoses of schizophrenia, bipolar disorder, and postpartum depression.  Finally, the petition summarized the prior dependency proceedings in Sacramento

---

[2] Mother subsequently informed the court that R.R. was not S.R.'s biological father.  The petition alleged that he had a substance abuse problem and that his whereabouts were unknown.  R.R. is not a party to the appeal, and we limit our discussion of allegations regarding him to those relevant to the issues mother raises.

County that led to S.R.'s half siblings being placed under the guardianship of their maternal grandmother in 2017.

## A. Detention Hearing

On July 15, 2020, the juvenile court detained S.R., finding that there was no reasonable means to ensure S.R.'s physical and emotional health without removing her from mother's physical custody. Mother told the juvenile court that although R.R. was listed on S.R.'s birth certificate, he was not her biological father. She provided another name for the biological father and said he did not know of S.R.'s existence. Further, mother did not know his whereabouts. Mother also stated that R.R. did not live with her. Mother's counsel stated that mother was seeking a protective order against R.R. and that mother was living in a safe location and was on the waiting list for the YWCA shelter. Mother further said that the prior dependency proceedings in Sacramento involved domestic violence in her 17-year marriage but that she was now divorced and the prior proceedings had nothing to do with S.R.

## B. Jurisdiction Hearing

On August 5, 2020, the Department filed a jurisdiction report recommending that the juvenile court bypass reunification services under section 361.5, subdivision (b)(10).[3] The recommendation was based on the

___

[3] Section 361.5, subdivision (b)(10)(A) states: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (10)(A) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems

4

prior Sacramento dependency proceedings, in which mother received reunification services but did not reunify.

The Department reported that when mother was interviewed about the allegations in the current petition, she was "emotionally labile," veering between being cooperative and defensive. At times she raised her voice, cried, and asked to be excused because she needed to vomit. Mother told the social worker that she had a traumatic brain injury in 2018 that caused her memory problems, but she also said she had fully recovered. She denied that her brain injury was from a domestic violence relationship, but mother's friend told the social worker that the injury was from a domestic violence incident that occurred with another man after mother divorced J.J. The report also attached police reports regarding the 2018 domestic violence incident, in which witnesses stated mother's then-boyfriend, Shamal R., punched mother's head with his fist and stomped on her head with his foot.

Mother admitted the recent domestic violence incidents described in the petition, but she denied that S.R. had been in the zone of danger. The police reports regarding the incidents in May 2020 and July 2020 state that mother told the police that S.R. was near her when R.R. assaulted her. Mother denied having mental health issues that prevented her from caring for S.R. She acknowledged that she had been diagnosed with postpartum depression, fibromyalgia, and bipolar disorder. Mother reported that she was no longer employed due to her disabilities and that she received Social Security disability benefits. Mother declined to sign a release to allow the Department to speak with her physician about whether she was taking her prescribed medications.

---

that led to removal of the sibling or half sibling of that child from that parent or guardian."

The Department reported that S.R. was doing well in her foster placement. Due to concerns about COVID-19 exposure, the Department recommended virtual visitation with mother.

On October 23, 2020, the Department filed an amended petition, adding an additional allegation under section 300, subdivision (b)(3) regarding mother's alleged substance abuse. The new allegation stated that mother tested positive for methamphetamine on September 11, 2020, and that in June 2019 mother asked a cousin to bring methamphetamine to her apartment and they both snorted several lines. Mother then began having paranoid thoughts and had a psychotic episode over the next few days in June 2019, during which she believed neighbors were " 'out to get her,' " and she wanted to hurt her neighbors. Law enforcement was summoned, it was determined that mother was a danger to herself and others, and she was transported to a hospital under section 5150.

On October 23, 2020, the Department filed an addendum report, which continued to recommend that mother be bypassed for reunification services. The Department reported that throughout the prior dependency cases regarding S.R.'s half siblings, mother tested positive for various substances and, ultimately, did not complete the substance abuse treatment she was offered. Since the detention hearing in the current case, the Department asked mother to submit to a drug test eight times. On four occasions, she did not test. On September 11, 2020, she tested positive for methamphetamine, and on other dates she tested positive for benzodiazepine and amphetamine. The Department noted that mother had a current prescription for alprazolam and Adderall. When mother was informed of her positive methamphetamine test, she insisted that it was a false positive and that she only uses the drugs prescribed by her physician. The Department reported that mother similarly

6

denied abusing drugs in her prior dependency proceedings regarding S.R.'s half siblings despite testing positive for cocaine.

The jurisdiction hearing was held on January 4, 2021. Mother's support person, S.B., testified that S.R. was not with mother during the May 13, 2020 domestic violence incident. S.B. saw mother on May 13, 2020, and observed bruises on mother's neck, face and arms, and marks in her mouth. S.B. further testified that mother previously had a substance abuse problem, five or six years earlier, but S.B. did not believe mother was currently abusing drugs. Social worker Melissa Tice testified consistently with the Department's reports. Tice also testified that in her experience Adderall does not produce a positive test result for methamphetamine.

At the conclusion of the hearing, the juvenile court struck the language in the amended petition alleging that S.R. was in the mother's care during the May 13, 2020, domestic violence incident. The juvenile court sustained the rest of the petition and found S.R. to be a person described in section 300, subdivisions (a), (b), (g) and (j). Mother was ordered to complete a psychological evaluation and submit to a hair follicle drug test.

### C.     Disposition Hearing

In advance of the disposition hearing, the Department submitted an update reporting that mother's hair follicle test taken on January 11, 2021, was positive for amphetamine and methamphetamine. The Department also reported that the prior September 11, 2020 toxicology screening was confirmed to be positive for both amphetamine and methamphetamine. The Department referred mother for an assessment for substance abuse treatment, and mother responded in writing, denying that she had a substance abuse problem and insisting that she only uses prescribed drugs. Mother did not complete a substance abuse assessment.

Mother submitted a psychological evaluation report prepared by Dr. Weedn, which was admitted into evidence at the disposition hearing. Dr. Weedn reviewed the records regarding the dependency proceedings, interviewed mother, and conducted various psychological assessments. Dr. Weeden also interviewed mother's close friend S.B., her personal physician, and her mother. Dr. Weeden stated that although mother appeared to want to cooperate, she was defensive and refused to talk about her past involvement with law enforcement and Child Protective Services. Mother explained them away as " 'in the past' " and not relevant. Mother was unable to reflect on her own past behaviors and instead blamed others, including social workers and abusive men. She believed that the police and social workers misrepresented her words and actions. She stated she completed all classes and services offered to her in the past but could not recall the names of them or produce certificates of completion. Mother contradicted herself regarding her brain injury, which her physician explained was the result of a skull fracture she suffered in a domestic violence incident that left her in a coma for several weeks. Mother acknowledged at one point that she had difficulty with cognition due to the injury but then said she was completely recovered.

Dr. Weedn diagnosed mother with generalized anxiety disorder, postconcussive syndrome, posttraumatic stress disorder, unspecified personality disorder (turbulent) style, and compulsive personality style. Dr. Weedn concluded mother's denial, minimization, and projection lead to impaired judgment. She believed that mother may need substance abuse treatment, based on her recent positive test for methamphetamine, and that mother also requires long-term psychiatric and psychological treatment, including trauma-informed care, for her personality disorders.

8

The juvenile court held the disposition hearing on February 8–9, 2021. S.B. and mother's adult daughter K.J. testified on behalf of mother. S.B. testified that mother's mental health had improved significantly in the past five years and that she was a good mother to S.R. K.J. also testified to positive changes in mother, including that mother held herself accountable for things she may have done wrong. K.J. lived with her grandmother but visited mother on weekends, and observed mother caring for S.R. and believed mother was able to meet S.R.'s needs.

The juvenile court found the Department met its burden to show that mother had not made reasonable efforts to address her substance abuse or domestic violence problems, which continued to exist. It denied family reunification services under section 361.5, subdivision (b)(10) and (13), and set a section 366.26 hearing for June 3, 2021.

### D. Section 388 Petition and Visitation

In May 2021, mother filed a petition under section 388 asking the juvenile court to continue the section 366.26 hearing and order six months of reunification services. In support of the petition, mother provided documentation that since February 2021, she had participated in multiple classes and programs regarding parenting, drug abuse and domestic violence, as well as joined a counseling group. Mother began weekly mental health therapy in April 2021. She alleged that she was maintaining her weekly virtual visits with S.R. and that they were close. S.R. knew mother's voice and called her " 'mommy' " during their visits. The juvenile court found mother made a prima facie showing of changed circumstances and granted her a hearing on her section 388 petition to be held in conjunction with the section 366.26 hearing. The hearings were continued to September 16, 2021.

9

In the interim, the Department filed a motion for a bonding study to aid in assessing the bond between mother and S.R. At the hearing on the motion, mother's counsel objected to the bonding study as untimely because it had been over 30 days since the bypass order. There was discussion on the record regarding the number of in-person visits that would be needed to complete a bonding study. S.R.'s counsel and the social worker voiced concerns that more than two to three weekly in-person visits would be very hard on S.R., and the Department then withdrew its motion for the bonding study. Mother's counsel requested that in-person visits resume in advance of the section 366.26 hearing. S.R.'s counsel objected to weekly in-person visits on the basis that S.R. had severe reactions to visits. The social worker stated that S.R. had severe separation anxiety, and she was concerned about in-person visits without the presence of S.R.'s foster parents. The juvenile court ordered one in-person visit for one hour, to be supervised by the Department, after which the parties were to return to court for a further hearing.

The Department also requested that the juvenile court order mother to sign a release so the Department could speak with her physician regarding her medications. The juvenile court stated it would not order mother to sign a release; however, it urged her to do so and noted that refusal to do so would be considered at the section 366.26 hearing. Mother refused to sign the release, but she agreed to another drug test.

On September 1, 2021, the Department filed a report from a social worker regarding the in-person visit on August 26, 2021. One social worker observed the visit in person, and a second social worker supervised the visit virtually. The report stated the social worker met with mother, S.R., and S.R.'s foster parents outside. As mother carried S.R. toward the visitation room, S.R. looked at her foster parents and began whining. When she

10

entered the visitation room, S.R. cried and called out for " 'mama' " multiple times.[4] Mother brought S.R. toys, a blanket she made, a snack, and a drink. Mother attempted to comfort S.R. but was unable to console her or engage her in play. S.R. cycled through episodes of whimpering, crying, calling for " 'mama,' " looking at the social worker, then shutting down and becoming flat in affect. She looked at mother once briefly as mother tried to play peekaboo and then began crying. After 25 minutes, S.R. became inconsolable and the visit ended. S.R. stopped crying when she was returned to her foster parents. Following the visit, S.R. reportedly remained quieter than usual and stayed in very close contact with her foster parents. She had difficulty falling and staying asleep through the next day, and she was more easily upset and more difficult to console. The social worker reported that although mother loved S.R., the Department did not believe in-person visitation was in S.R.'s best interests. The Department recommended that visits revert to virtual only pending the section 366.26 hearing.

At the September 1, 2021, interim hearing, S.R.'s counsel also requested that visitation return to virtual only. Mother stated that the Department's report did not accurately describe the visit and that she was able to soothe S.R. The juvenile court considered whether to permit further in-person visits but ultimately decided to revert to virtual visits.

### E.    Section 366.26 Report and Hearing

The Department's report in advance of the section 366.26 hearing recommended termination of parental rights and a plan of adoption. S.R.'s foster parents, with whom she had lived since July 2020, when she was five months old, wished to adopt her. The Department stated its continuing

---

[4] Based on the context described in the report, we understand that S.R.'s cries for " 'mama' " referred to her foster mother.

11

significant concerns regarding mother's parental fitness despite her commendable recent progress in programs and classes addressing domestic violence, substance abuse, and parenting skills. It noted that due to mother's refusal to sign releases that would allow the Department to speak with her health care providers, the Department was unable to determine whether mother's August and September 2021 positive drug tests for benzodiazepine, amphetamine and THC were attributable to prescription drugs in the prescribed dosages. The Department was also concerned that mother was not working with a psychiatrist despite her significant mental health history. Mother continued to be emotionally labile, alternating between being cooperative and hostile.

The Department further stated that although mother recently completed parenting classes, she continued to show a lack of understanding regarding S.R.'s emotional cues, as evidenced by the in-person visit in August 2021. During a telephone conversation between the social worker and mother, the social worker attempted to discuss S.R.'s distress and trauma response. Mother became defensive and hung up on the social worker. The Department did not believe there was a significant change in mother's behavior to warrant continuing the section 366.26 hearing or delaying permanency for S.R.

The Department reported that due to public health orders regarding COVID-19, the visits were primarily virtual throughout the proceeding. Mother consistently attended visits. During the virtual visits, mother was excited and happy to see S.R. and talked to her in " 'baby talk,' " told her she loved her, sang to her, and read her books. S.R. often held the phone and ran around. She generally did not respond to mother but engaged for short periods with the encouragement of her foster parent. The virtual visits often

12

ended early at mother's request based on her belief that S.R. needed a nap. In addition to the August 2021 in-person visit, the Department reported that there were two in-person visits in November 2020 and two in February 2021. According to notes from the in-person visits, the Department reported that S.R. had difficulty transitioning to the visits and often cried for significant periods of time. Mother held S.R., sang to her, and told her she loved her, but was not able to engage S.R. in play. S.R. appeared to "zone out" while mother held her and sang to her.

S.R. was happy and well cared for in her foster home, where she had spent the majority of her life. She identified her foster parents as her parents and looked to them to meet her needs. S.R. had substantial emotional ties to her foster family, and the Department opined that removing her from their care would be detrimental.

The combined section 388 and section 366.26 hearing was held on November 19, 2021. Mother testified that she had been participating in the Drug Abuse Alternatives Center (DAAC) program for nine months and admitted she had been using methamphetamine. The DAAC program included relapse prevention, anger management, parenting recovery, triggers, domestic violence, life skills, and coping skills. She also attended domestic violence classes at the YWCA and the Center for Domestic Peace. She learned to identify "red flags" for domestic violence and how to protect herself. She had a safety plan to guard against domestic violence in the future, which included the support of her mother, her "sober sisters," and the YWCA. She also took several parenting classes, where she learned how to create a safe environment and establish routines and stability for her children. She testified that virtual visits were challenging with a five-month-old, but she did the best she could and became creative by using music boxes

13

and books. Once, she sang S.R. to sleep. Mother testified that the visits went well and denied that S.R. was ever traumatized by them. Regarding her medications, mother said her doctor wrote a letter confirming that she had valid prescriptions for the medications she took, but she was not able to pick it up before the hearing. She acknowledged that she would not allow the Department to speak with her doctor. She explained she believed the Department would use information from her doctor to attack her. Mother believed it was in S.R.'s best interests to be with her biological family.

Grandmother testified that mother had regained her self-esteem, was off drugs, and had a good relationship with her older children, who were under grandmother's care. Mother's older daughter K.J. testified that after participating in services, mother's demeanor improved. She was more thoughtful and focused. K.J. believed mother's issues with domestic violence and substance abuse were behind her and that she could provide for S.R. financially and emotionally.

The Department social worker acknowledged that mother had made progress and should be commended for her efforts at seeking services on her own. However, she believed that S.R.'s reaction to mother did not evidence an emotional attachment. Mother still had difficulty recognizing S.R.'s cues and was unable to engage her. S.R. did not seem to look forward to the visits, and she was usually exhausted afterward. S.R. was very comfortable in her foster home and was attached to her foster parents. The social worker testified that delaying permanency for reunification efforts would be detrimental to S.R. S.R. had a stable environment in her foster home, where she had lived for the majority of her life. It would not be detrimental to S.R. to terminate parental rights. S.R. was specifically adoptable, and her need

14

for stability and permanency outweighed any relationship she had with mother.

Mother's counsel argued that it was in S.R.'s best interests for the juvenile court to grant mother's section 388 petition to allow for six months of reunification services. Alternatively, counsel argued for the application of the parental benefit exception to termination of parental rights. Counsel for S.R. and counsel for the Department each argued that although mother's circumstances were in the process of changing, mother did not meet her burden of establishing changed circumstances because her programs and treatment were not yet completed. They further argued that it was in S.R.'s best interest to provide stability and permanency for her. Regarding the parental benefit exception, the Department's counsel argued that mother failed to demonstrate S.R. had a significant emotional attachment to mother or that termination of parental rights would be detrimental to S.R. Although mother loved S.R., she failed to show that their relationship was so strong that it outweighed the permanency and stability S.R. would gain from adoption.

The juvenile court denied mother's section 388 petition, finding that although mother met her burden of proving a change in circumstances, she did not prove that her request for reunification services was in S.R.'s best interests. Regarding the section 366.26 hearing, the juvenile court noted it was undisputed that S.R. was adoptable. It further found mother failed to meet her burden to show the parental benefit exception applied. The court noted S.R.'s young age and that she had spent less than one-third of her life in mother's care. It reviewed the factors identified by the Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and found that mother established that there was regular visitation but not that S.R. benefited from

15

the visits. Instead, there was evidence of negative effects on S.R., which mother did not recognize. Finally, the juvenile court explained that the exception applies only where there is evidence of a significant, positive emotional attachment, which there was not. The court terminated parental rights and ordered adoption as S.R.'s permanent plan.

## DISCUSSION

### I. *Section 388 Petition*

Section 388 permits a parent to petition the juvenile court for a hearing to modify an earlier order based on a change of circumstances or new evidence. (§ 388, subd. (a)(1).) To prevail, a parent must show by a preponderance of the evidence that (1) there has been a change in circumstances or new evidence *and* (2) the proposed modification would be in the best interests of the dependent child. (*In re J.M.* (2020) 50 Cal.App.5th 833, 845 (*J.M.*).) Establishing that the modification is in the child's best interests is a difficult burden in cases where reunification services have been terminated or bypassed because after termination of reunification services, the focus of a dependency proceeding shifts from the parents' interest in the care, custody, and control of the child to the child's need for permanency and stability. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464.) There is a rebuttable presumption that continued foster care is in the child's best interest, and that presumption "applies with even greater strength when the permanent plan is adoption rather than foster care." (*Ibid.*) We review orders on section 388 petitions for abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Mother argues the juvenile court abused its discretion when it denied her section 388 petition. Specifically, she contends the juvenile court erred when it found mother did not meet her burden to show the proposed

16

modification was in S.R.'s best interest. According to mother, the juvenile court erroneously made a simplistic comparison between the care S.R. would possibly receive with mother and the care she received in her foster home. She relies on *J.M., supra*, 50 Cal.App.5th 833, and *In re I.B.* (2020) 53 Cal.App.5th 133 (*I.B.*), and argues that these authorities require a more nuanced analysis of the child's best interest than a comparison of the parent's home to the home of the longtime caregivers.

*J.M., supra*, found that mother's completion of all required domestic violence training and lack of contact with the abusing father for over a year constituted changed circumstances where domestic violence was the sole basis for dependency jurisdiction. (50 Cal.App.5th at pp. 836–837, 846, 849.) It further found that the trial court abused its discretion when it determined that placement with mother would not be in the child's best interest. (*Id.* at p. 851.) One of the factors to consider in determining the child's best interest is the relative strength of the child's relationship with his or her parent compared to his or her relationship with his or her caregivers. (*Id.* at p. 849.) *J.M.* explained that the child's strong bond with his caregivers was not " 'dispositive . . . lest it create its own self-fulfilling prophecy.' " (*Ibid.*) In *J.M.* the agency reported that the relationship between mother and her child was "blossoming" despite their having only weekly visits. (*Ibid.*) J.M.'s counsel joined in mother's petition arguing in favor of returning J.M. to mother. (*Id.* at p. 843.) There was evidence from the social worker that mother soothed J.M. when he was upset and that J.M. was pleased to see mother, which he expressed by smiling and reaching out. (*Ibid.*) Here, there is no similar evidence of a strong bond between mother and S.R.

*J.M., supra*, is also distinguishable because there, domestic violence was the only basis for the dependency petition. (50 Cal.App.5th at pp. 836–

837, 846, 849.)  Here, mother's substance abuse and mental health are also at issue.  Although mother provided evidence that she was participating in the DAAC program, she did not permit the Department to speak with her physician regarding her prescription medications.  Further, Dr. Weedn concluded mother needs long-term psychiatric and psychological treatment for her personality disorders.

*I.B., supra*, also involved a mother who overcame domestic violence issues and filed a section 388 petition requesting return of her three-year-old son to her care.  (53 Cal.App.5th at pp. 135–136.)  The juvenile court granted the petition, finding that mother demonstrated changed circumstances and that it was in I.B.'s best interests to be returned to her care.  (*Id*. at p. 150.)  There was evidence that I.B. was bonded with mother, who was a constant and positive presence in his life.  (*Id*. at p. 159.)  The Court of Appeal explained that even the evidence of bonding may not be enough to rebut the presumption that adoption by the foster family was in I.B.'s best interests.  (*Id*. at p. 160.)  However, there was also overwhelming evidence that I.B. was being abused in his foster placement by his older brother, who had extreme emotional and behavioral issues.  (*Id*. at pp. 160–161.)  Under those circumstances, the Court of Appeal found no abuse of discretion in granting mother's petition to return I.B. to her care.  (*Id*. at p. 162.)  In contrast, here there was no evidence S.R. was bonded with mother; nor was there any evidence that her foster placement was detrimental.  Rather, the evidence showed that S.R. was happy and well cared for by her foster parents and that she had substantial emotional ties to them.

Mother further argues that her petition should have been granted to "rectify two years of errors in failing to provide her with meaningful visitation with her infant turned toddler."  Citing *In re Hunter S.* (2006) 142

18

Cal.App.4th 1497 (*Hunter S.*), mother claims that her visitation was "'illusory'" given that most of the visits were virtual, which even the juvenile court stated was "basically worthless" with a child S.R.'s age. The Department argues that mother has forfeited this argument because she did not raise it below as part of her section 388 petition. (See *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1127 [forfeiture rules apply in dependency cases].)

In her reply brief, mother argues that she complained about visitation at "every opportunity . . . ." However, the record citation she provides is to the June 3, 2021 hearing at which the juvenile court agreed to grant a hearing on mother's section 388 petition.[5] At that hearing, mother's counsel requested visitation be increased to weekly visits and the court agreed. There was no discussion as to whether the visits would be virtual or in person. Mother's section 388 petition, filed prior to the June 3, 2021 hearing, stated she was maintaining her relationship with S.R. through virtual visits. Neither in mother's written section 388 petition nor at the June 3, 2021

---

[5] Mother's reply brief also cites to the January 4, 2021, jurisdiction hearing but does not provide the correct reporter's transcript page number. Our own review of the transcript for the January 4, 2021, hearing reveals that mother's counsel noted mother was receiving only virtual visits but did not request a change in visitation. The Department social worker clarified that the visits were initially virtual and then beginning in November 2021 there were several in-person visits and then after a shelter-in-place order the virtual weekly visits resumed. The social worker stated mother missed one of the in-person visits without notice and she often ended the virtual visits early. At this point, the juvenile court questioned how much an infant benefits from a virtual visit but stated virtual visits are better than no visits. It was in this context that the court stated, "[T]here is a lot of information that says that these visits are basically worthless," before commenting that it may be best for the infant if the virtual visits ended early, as mother often requested. The juvenile court then proceeded with the contested jurisdiction hearing.

hearing did she specifically request in-person visitation. It was not until the August 11, 2021 hearing to consider the Department's request for a bonding study that mother requested in-person visitation, which she was granted on a trial basis. At the combined section 366.26/section 388 hearing, mother's counsel argued both that virtual visits "hugely impacted" mother's ability to bond with S.R. and that her visits and interactions with S.R., including the in-person visit in August 2021, went well and were beneficial to S.R. On this record, we agree with the Department that mother has forfeited the argument that her section 388 petition should have been granted as a remedy for a lack of meaningful visitation because she failed to raise this issue below. (*In re Malick T., supra,* 73 Cal.App.5th at p. 1127.)

However, even if we did not find the argument forfeited, we would reject it. Mother's reliance on *Hunter S.* is inapposite. There, the juvenile court ordered visitation " 'as can be arranged,' " but the child refused to visit despite efforts by a social worker, relatives, and his therapist. (*Hunter S., supra,* 142 Cal.App.4th at p. 1501.) The Court of Appeal found that the order was improper because it essentially gave the minor complete discretion to veto visitation. (*Id.* at p. 1505.) Here, visitation was permitted, albeit virtually for most of the proceedings due to shelter-in-place orders and COVID-19 health concerns. When mother requested in-person visitation in August 2021, the juvenile court granted the request for an initial visit. The record does not show that mother requested in-person visits prior to August 2021. (See *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 [stating that it is the parent's burden to initiate motions to modify visitation orders and that "[t]he court does not err by failing to do that which it is not requested to do"].) After receiving a report from the Department social worker that the August 26, 2021, in-person visit was detrimental to S.R., the juvenile court acted

20

within its discretion by discontinuing in-person visitation and resuming virtual visits. (§ 366.21, subd. (h) [after family reunification has been bypassed, visitation must continue unless the court finds it would be detrimental to the child].)

## II. *Termination of Parental Rights*

Mother contends the juvenile court erred in terminating her parental rights because it (1) improperly relied upon the lack of a " 'parental relationship' " (boldface omitted), (2) failed to consider the parent–child relationship in the context of the visitation allowed, and (3) improperly considered a possible promise of postadoption contact between mother and S.R. Mother argues these aspects of the juvenile court's reasoning violate the criteria for determining the applicability of the parental benefit exception, which was recently clarified by the Supreme Court in *Caden C., supra*, 11 Cal.5th 614. We find no error.

### A. Legal Framework

At a section 366.26 hearing, the juvenile court selects a permanency plan for the dependent child. (§ 366.26, subd. (b).) At this stage of the proceedings, if the juvenile court finds by clear and convincing evidence that the child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) However, section 366.26, subdivision (c) provides certain enumerated exceptions which permit the juvenile court, " 'in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Caden C., supra*, 11 Cal.5th at p. 631.) The exception relevant here is the parental benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) To prove this exception applies, the parent must establish "(1) regular *visitation and contact*, (2) a *relationship*, the continuance of which would *benefit* the child such that (3) the termination

21

of parental rights would be *detrimental* to the child." (*Caden C.*, at p. 631, original italics.) As to the first element, the juvenile court considers whether the parent visits consistently, "taking into account 'the extent permitted by court orders.' " (*Id.* at p. 632.) As to the second element, the court assesses whether the child has a "substantial, positive, emotional attachment to the parent . . . ." (*Id.* at p. 636.) In making this determination, the proper focus is on the child, and the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632.)

Regarding the third element, the juvenile court decides "whether the harm of severing the parental relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Caden C., supra*, 11 Cal.5th at p. 633.) As explained by the Supreme Court, the juvenile court is not comparing the parent's attributes as custodial caregiver to those of the potential adoptive parents. Instead, "the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Id.* at p. 634.)

## B.    Standard of Review

*Caden C., supra*, clarified that determinations regarding the parental benefit exception are reviewed under a hybrid standard of review. (11 Cal.5th at pp. 639–640.) As to the first two elements, which are factual determinations, the reviewing court applies a substantial evidence standard of review. (*Ibid.*) The third element—whether termination of parental rights would be detrimental to the child—is reviewed for abuse of discretion. (*Id.* at pp. 640–641.) An abuse of discretion occurs only when " ' " 'the trial court has

exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.) If two or more inferences can reasonably be deduced from the facts, the reviewing court may not substitute its judgment as to what is in the child's best interests. (*Ibid.*)

### C. Analysis

Mother contends the juvenile court's statement that during mother's visits she "had not in effect been a parent . . . because the child was too young" was improper because *Caden C.* does not use the " 'parental role' " label and post-*Caden C.* decisions do not use the label and, instead, examine the relationship on a case-by-case basis. (See *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210–212.) We find no error. The juvenile court carefully considered the criteria discussed in *Caden C.* and determined the evidence did not support a finding of a "significant, positive emotional attachment." (*Caden C., supra*, 11 Cal.5th at p. 636.) The juvenile court first determined there had been regular visitation. (*Caden C.*, at p. 632.) It then considered S.R.'s young age and the fact that she spent less than one-third of her life with mother. (*Ibid.*) Most significantly, the juvenile court considered the impact of the visits on S.R. and found that there was evidence the visits had a negative effect on S.R. and that mother did not recognize the negative impact. In discussing the visits, the juvenile court commented that mother "has not been a parent" during the visits. The juvenile court then concluded, "[T]he [parental benefit] exception applies only where the visits have resulted in a significant, positive emotional attachment. [¶] The evidence does not support that. In fact, the evidence suggests there is not a significant, positive emotional attachment."

We recognize that *Caden C.* does not use the words " 'parental role' " in its analysis of the parental benefit exception (*In re L.A.-O., supra*, 73

Cal.App.5th at p. 210 & fn. 3), and that other courts have found it improper for a juvenile court to rely primarily on a parent's failure to act in a parental role in determining whether the parental benefit exception applies. (E.g., *In re D.M.* (2021) 71 Cal.App.5th 261, 270–271 [holding court erred in equating "parental role" with attendance at medical appointments and understanding medical needs, and remanding for determination of whether there is a "substantial, positive emotional attachment"]; *In re J.D.* (2021) 70 Cal.App.5th 833, 864, 870 [finding "parental" descriptor to be vague and unhelpful and remanding to determine whether child had substantial, positive emotional attachment to the parent as discussed in *Caden C.*]; *In re L.A.-O., supra*, at pp. 211–212 [same].) However, here, we find no error because the record establishes that the juvenile court properly focused its determination on whether there was evidence of a "significant, positive emotional attachment," and its finding that there was not is supported by the social worker's testimony regarding S.R.'s reactions to the visits. (See *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319–320 [affirming juvenile court's determination that parental benefit exception did not apply where court found father did not occupy a " 'significant parental role' " and there was a lack of a strong, positive attachment, which was supported by substantial evidence].)

Next, mother argues the juvenile court erred by failing to evaluate the visitation and contact between mother and S.R. in terms of " '*the extent permitted by court orders*' " as stated in *Caden C.* (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) The record does not support mother's position. The juvenile court, in fact, found that mother established regular visitation, which satisfied the first portion of the parental benefit exception. (*Caden C.*, at p. 632.) Mother again argues that the visitation was ineffective and

24

prevented her from establishing a bond with S.R. As discussed *ante*, mother argued the opposite below when she asserted that she and S.R. had established a bond through their weekly visitation, most of which was virtual. Further, although *Caden C.* discussed visitation in the context of what is permitted by court orders, the overriding focus of the parental benefit exception is whether there is evidence of a " 'significant, positive, emotional attachment from child to parent.' " (*Caden C.*, at p. 632.) Nothing in *Caden C.* suggests that this standard should be altered depending upon the type of visitation offered to the parent.

Mother further argues the juvenile court improperly relied on the promise of the prospective adoptive parents to allow contact and "attempted to induce [mother] to accept the adoption of her daughter . . . [based] on expectations that she would be allowed to continue to be a second mother to [S.R.]." She relies on *In re S.B.* (2008) 164 Cal.App.4th 289, which found the juvenile court erred when it found the parental benefit exception did not apply. (*Id.* at p. 300.) The juvenile court in *S.B.* recognized that S.B. would benefit from continuing her relationship with her father but based its decision to terminate parental rights in part on the grandparent caregivers' willingness to allow the father to continue to visit S.B. The Court of Appeal reversed, finding "a parent should not be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents." (*Id.* at pp. 298–300, 303; see *In re C.B.* (2010) 190 Cal.App.4th 102, 128 [finding that in determining whether beneficial relationship exception applies, it is improper to consider prospective adoptive parents' willingness to allow the children to continue contact with birth parent].)

The record does not support mother's contention that the juvenile court improperly relied on any "unenforceable promise of future visitation" by the prospective adoptive parents. The Department reported that it informed both the prospective adoptive parents and mother about the possibility of entering into a written agreement pursuant to Family Code section 8165.5, to arrange for continued contact between mother and S.R. after adoption, and that it made a referral to the Consortium for Children. The Department further reported that mother was not interested in exploring a plan for postadoption contact and was focused only on having S.R. returned to her care. Unlike in *In re S.B.* and *In re C.B.*, the juvenile court here found that S.R. did not have a strong emotional attachment to mother, and it then "suggest[ed]" that mother "change [her] mindset" and "[e]xplore" the opportunity to plan for future contact with S.R. Nothing in the record suggests that the juvenile court based its ruling on "an unenforceable promise of future visitation" to which mother had not even agreed. Instead, the juvenile court simply suggested that mother might wish to reconsider exploring the possibility of postadoption contact with S.R.

## III.  *ICWA*

Mother argues that the juvenile court never made a definitive ICWA finding as to S.R. or determined if the Department complied with its duties under ICWA. The Department concedes, and the record reflects, that although mother initially denied Native American heritage, on July 23, 2020, she informed the Department that she had Apache ancestry " 'out of San Antonio, Texas.' " She identified an uncle, L.R., as having a family tree but said he refused to provide information to the family. The Department sent notices to eight Apache tribes, which included information about some of mother's relatives, but did not reference her uncle, L.R.

26

At the initial hearing on July 15, 2020, the court stated that ICWA may apply and reserved the issue. The Department's September 16, 2021, section 366.26 report stated that two of the tribes it notified did not respond and that the other tribes responded that S.R. was ineligible for membership. The report recommended that the juvenile court find that ICWA does not apply. At the combined section 388/section 366.26 hearing, neither party raised the ICWA issue and the juvenile court did not make any findings regarding ICWA.

The juvenile court must decide whether ICWA applies in every dependency proceeding. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048.) Sections 224.2 and 224.3 specify the steps the Department and the juvenile court are required to take in determining a child's possible status as an Indian child and in providing ICWA notices. (*In re D.S.*, at pp. 1048–1049.) Here, as the Department concedes, the juvenile court failed to make any ICWA findings prior to terminating parental rights. Accordingly, we will remand for the juvenile court to ensure compliance with ICWA and the related directives of sections 224.2 and 224.3.

## DISPOSITION

The order denying mother's section 388 petition is affirmed. The order terminating parental rights is conditionally affirmed and remanded to the juvenile court for the limited purpose of determining whether the Department discharged its duty of inquiry and notice under sections 224.2 and 224.3, and whether ICWA applies. If the juvenile court determines that ICWA does not apply, the order terminating parental rights shall remain in effect. If the court determines ICWA applies, it shall vacate its order terminating parental rights and proceed in accordance with ICWA and related state law.

27

_____
Jackson, P. J.

WE CONCUR:


_____
Simons, J.


_____
Wiseman, J.*


A164102/*Sonoma County Dept. of Human Services v. A.R.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.